**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KIMBERLY LYNN BAUER, | CASE NO. 1:22-cv-01979 |
| Plaintiff, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Kimberly Lynn Bauer ("Plaintiff" or "Ms. Bauer") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.        Procedural History

Ms. Bauer filed her SSI application on August 5, 2020.  (Tr. 18, 57, 162-68.)  She alleged a disability onset date of April 1, 2020 (Tr. 18, 162) due to degenerative disc disease and herniated discs (Tr. 58, 69, 83, 93, 186).  After initial denial by the state agency (Tr. 79-83) and denial upon reconsideration (Tr. 91-93), Ms. Bauer requested a hearing (Tr. 94-99).  A telephonic hearing was held before an Administrative Law Judge ("ALJ") on September 9, 2021.  (Tr. 34-56.)  The ALJ issued an unfavorable decision on September 27, 2021, finding Ms. Bauer

1

not disabled.  (Tr. 15-33.)  The Appeals Council denied Ms. Bauer's request for review of the

ALJ's decision on September 1, 2022, making the ALJ's decision the final decision of the

Commissioner.  (Tr. 1-6.)  Ms. Bauer then filed the pending appeal.  (ECF Doc. 1.)  The matter is

fully briefed.  (ECF Docs. 10, 12, 13.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Bauer was born in 1978.  (Tr. 28, 37.)  At the time of the hearing, she was living with

a roommate and had a boyfriend.  (Tr. 38-39.)  She graduated from college (Tr. 187) and had

past relevant work as a registered nurse (Tr. 41, 51-52).

### B.     Medical Evidence

#### 1.     Relevant Treatment History

##### i.     Physical Impairments

Ms. Bauer presented to Marzena Buzanowska, M.D., at Hillcrest for a distance health

visit on May 1, 2020, complaining of low back, right hip, and right leg pain.  (Tr. 873-74.)  She

reported that the pain started about three weeks earlier.  (Tr. 874.)  Physical therapy was

recommended, and she was prescribed gabapentin and a Medrol dose pack.  (Tr.  877.)

Ms. Bauer presented to the emergency room at Hillcrest Hospital a few days later, on

May 5, 2020, complaining of right hip and leg pain that was progressively getting worse.  (Tr.

868.)  An x-ray from that visit showed mild osteoarthritis of the right hip, with over coverage of

the right femoral head by the acetabulum that could possibly result in pincer-type

femoroacetabular impingement.  (Tr. 872, 1018.)  A physical examination revealed tenderness in

the right hip, but normal strength and normal range of motion.  (Tr. 871.)  Pain was exacerbated

by internal rotation of the hip, but there was no evidence of erythema or swelling.  (*Id*.)  Lumbar

2

examination was normal. (*Id*.) Clinical impressions were: right hip pain, right-sided sciatica, and femoroacetabular impingement of right hip. (Tr. 872.) She was provided prescriptions for Flexeril and Lidoderm patches, and advised regarding "multimodal therapy including heating pad, massage, physical therapy, [and] TENS unit." (*Id*.) She was discharged the same day. (*Id*.)

A lumbar MRI from May 27, 2020, revealed a right posterior disc herniation at L4-L5 that impinged upon the exiting right L4 nerve roots and the descending right L5 nerve roots and contributed to mild stenosis of the right aspect of the spinal canal and right lateral recess, as well as mild right neural foraminal stenosis. (Tr. 821, 835, 846, 1012-18.) Findings at L5-S1 were unremarkable. (Tr. 846, 1014.)

Ms. Bauer continued to report worsening pain and attempted various treatment modalities, including physical therapy, medications, and lumbar epidural steroid injections. (Tr. 821, 843, 847, 852, 855-856, 860-61, 864, 867.) After failing to respond to the various treatments, Ms. Bauer presented to neurosurgeon Deborah Benzil, M.D., at Hillcrest on July 20, 2020, for back and right hip pain. (Tr. 847.) On examination, she had a positive straight leg raise with + 2 pulses, no focal weakness, and no numbness. (Tr. 849.) Ms. Bauer opted to proceed with surgery to address her pain. (*Id*.)

On August 12, 2020, Ms. Bauer underwent a right L4-L5 microdiscectomy performed by Dr. Benzil. (Tr. 832-33, 849.) In a post-operative follow-up phone call six days later, Ms. Bauer reported that she no longer had to take Norco because she did not have as much pain and the ibuprofen was "enough." (Tr. 1269.) She indicated she was walking well unassisted and denied any additional concerns. (*Id*.) Ms. Bauer presented to James Bowen, PA-C, for a two-week post-operative visit on August 28, 2020. (Tr. 1282.) She reported that her distal radicular pain was improved, but she was still having right hip pain that she had prior to her surgery. (*Id*.) PA

3

Bowen noted that the location of Ms. Bauer's reported pain "was more consistent with hip bursitis or . . . sciatica versus SI joint inflammation." (*Id*.) On examination, sensation was intact and she had normal strength in the upper and lower extremities. (*Id*.) PA Bowen noted that Ms. Bauer was "slowly improving." (*Id*.) He ordered a dose of steroids and recommended ice. (*Id*.)

While in county jail on a probation violation during September 2020, Ms. Bauer's fiancé contacted her medical providers, reporting she was having a lot of pain and was not being provided with the medications she needed. (Tr. 797, 1297-98.) PA Bowen spoke with a nurse that managed medical care for county prisoners who informed him that Ms. Bauer was on a muscle relaxant and a steroid, but that opioid medications were not allowed. (Tr. 1298.)

Ms. Bauer returned to PA Bowen for a post-operative visit on October 9, 2020. (Tr. 1296.) She was still complaining of right hip pain and lateral leg pain down to her feet. (*Id*.) She reported she was taking ibuprofen, gabapentin, and a muscle relaxant. (*Id*.) She felt her incarceration had slowed her recovery because her therapy was limited. (*Id*.) She reported her pain control had improved since her release, but expressed concern that her symptoms had not improved more. (*Id*.) An examination revealed intact sensation, normal strength in the upper and lower extremities and no significant pain with right hip range of motion. (*Id*.) PA Bowen noted Ms. Bauer was "slowly improving." (*Id*.) He noted that Ms. Bauer's pain could still be hip bursitis, but observed that she described more radicular leg pain on examination, which would not appear to be her hip. (*Id*.) He ordered physical therapy and Valium as a muscle relaxant. (*Id*.) Ms. Bauer was provided with refills of her Valium over the phone later that month due to continued reports of spasms. (Tr. 1312-14.) Her prescription was refilled at a lower frequency because she was two months post-op and they were trying to wean her over time. (Tr. 1313.)

4

Ms. Bauer returned to Dr. Benzil for follow up on November 16, 2020.  (Tr. 1369.)  She reported some right lateral thigh pain, but no back pain and no "real pain" in her lower leg.  (*Id*.)  Ms. Bauer reported no new weakness or numbness.  (*Id*.)  She had not started physical therapy.  (*Id*.)  On examination, her leg strength and sensation were full.  (*Id*.)  Dr. Benzil noted that Ms. Bauer reported some new symptoms following her surgery, but there were no "red flags."  (*Id*.)  Dr. Benzil recommended x-rays to confirm no instability.  (*Id*.)  If no instability, then Dr. Benzil indicated Ms. Bauer should start physical therapy.  (*Id*.)  Ms. Bauer's lumbar x-rays showed that Ms. Bauer's scoliosis was slightly worse, but there was no instability.  (Tr. 1370, 1383-86.)

Ms. Bauer presented for a virtual visit with Katie Evanchick, PA-C, at the Cleveland Clinic on November 20, 2020, for a "med spine" consultation; she was too far out from her surgery to continue medication management through her neurosurgeon.  (Tr. 1363.)  She reported that residual radicular pain started about a week after her surgery.  (*Id*.)  She was walking daily, doing home exercises, and managing pain with medication.  (*Id*.)  On examination, she was alert, appropriate, happy, smiling, interactive, and in no distress.  (Tr. 1365.)  She had full range of motion in her back, there were no obvious neurologic deficits, she was able to toe/heel walk, and her gait was normal.  (*Id*.)  PA Evanchick advised Ms. Bauer to start physical therapy and continue pain management with Naprosyn, Skelaxin, Neurontin, and Tylenol for additional pain control.  (*Id*.)

Ms. Bauer returned to PA Evanchick on December 16, 2020, for follow up.  (Tr. 1357.)  She reported the distribution of her symptoms had not changed and she rated her pain a three out of ten.  (*Id*.)  She had not started physical therapy because she did not have a vehicle.  (Tr. 1361.)  Ms. Bauer's physical examination findings were unremarkable.  (*Id*.)  PA Evanchick

recommended that Ms. Bauer continue her current regimen but try to cut down on use of Skelaxin.  (Tr. 1362.)  She provided Ms. Bauer with an updated order for physical therapy.  (*Id.*)

Ms. Bauer started physical therapy on January 19, 2021, at the Cleveland Clinic.  (Tr. 1352-57.)  She attended six sessions in total.  (Tr. 1349-57, 1339-45.)  Her last session was on March 3, 2021, when her therapy was discontinued due to "goal achievement" and "maximal benefit."  (Tr. 1339.)  It was noted that Ms. Bauer "demonstrated improvement in her activity tolerance and independence for [home exercise program] however she continue[d] to complain of radicular pain in the [right lower extremity].  She [had] full [range of motion] but [did] get peripheralization with repeated flexion."  (*Id.*)  Examination revealed some weakness in her right hip (4- to 4+/5) and left hip (4-/5), diminished sensation in the right lower extremity, lumbar tenderness in the paraspinals, but a negative straight leg raise testing and normal gait.  (Tr. 1340-41.)  It was recommended that she focus on home exercises involving repeated extension and use ice for low back aching and soreness.  (Tr. 1339.)

### ii.        Mental Health Impairments

Ms. Bauer presented to Lutheran Hospital's emergency room on April 2, 2020, for evaluation of her alcohol problem.  (Tr. 878.)  She reported that she had a history of bipolar disorder and alcohol abuse.[1]  (*Id.*)  She said she had started drinking a week earlier.  (*Id.*)  She requested and was admitted for alcohol detox.  (Tr. 882, 885.)

After completing detox, Ms. Bauer presented for a telehealth mental health assessment with Amanda Collins, LPCC, at Signature Health on April 7, 2020.  (Tr. 735-36.)  She reported that a doctor at Lutheran Hospital referred her because he thought she had "an uncontrolled

---

[1] Prior to her alleged onset date of April 1, 2020, Ms. Bauer received treatment for her substance abuse and mental health conditions, including mental health hospitalizations, partial hospitalizations programs, intensive outpatient programs and counseling, and drug treatment programs.  (*See e.g.*, Tr. 247-49, 532-33, 734, 933, 1321-22.)

6

mental health thing going on and that's why [she] turn[ed] to substances, that [her] mental health [wasn't] being managed correctly." (Tr. 736.) Ms. Bauer felt her substance abuse had been addressed and she wanted to continue with medication. (*Id*.) She reported that her medications included naltrexone, Effexor, gabapentin, Vistaril, and trazodone. (*Id*.) She said she was grieving the loss of her mother, taking care of her father, not working or driving, and dealing with her probation. (*Id*.) LPCC Collins observed that Ms. Bauer was oriented x4, cooperative, and friendly with tangential speech. (Tr. 737.) LPCC Collins recommended a "Medication Assisted Treatment Program and individual counseling" and Ms. Bauer agreed. (*Id*.)

Plaintiff presented to William Fikter, M.D., for a psychiatric evaluation on April 13, 2020. (Tr. 806-12.) She reported that naltrexone had helped with cravings and withdrawal and that she had attended an online meeting. (Tr. 812.) She had lost her nurse's license due to opiate abuse and diverting narcotic pain medications. (*Id*.) No mental status examination findings were recorded. (Tr. 808-09.) Ms. Bauer was diagnosed with post-traumatic stress disorder and her medications (including naltrexone, Effexor, gabapentin, trazodone, oxcarbazepine, and Vistaril) were continued. (Tr. 811-812.)

Ms. Bauer returned to Dr. Fikter for medication management six times between April 27, 2020, and August 19, 2021 (Tr. 768-798, 1431-1443), for mental health conditions which included: post-traumatic stress disorder; generalized anxiety disorder; alcohol use disorder, mild, in early remission; and depression (Tr. 773, 781, 789, 797, 811). Ms. Bauer also participated in individual counseling at Signature Health from April through August 2020, usually treating with Jenny Row, LISW, on a weekly basis. (Tr. 553-59, 560-93, 667-732.)

During a video appointment with Dr. Fikter on April 27, 2020, she was cooperative with normal speech and language. (Tr. 770-71.) Her attention span was fair and her mood and affect

had a "fair range."  (Tr. 771.)  Her thought process was linear, her associations were intact, her fund of knowledge was average, and her memory, judgment, and insight were fair.  (*Id*.)  She denied suicidal, homicidal, and psychotic thoughts.  (*Id*.)  She reported that her anxiety had improved since starting oxcarbazepine.  (Tr. 774.)  She reported eating and sleeping well, and said she was participating in intensive outpatient treatment and attending meetings online.  (*Id*.)  Dr. Fikter decreased Effexor and continued the remainder of her medications.  (Tr. 774-75.)

At her appointment with Dr. Fikter on May 28, 2020, Ms. Bauer reported doing well with her recovery and that her mood had been stable and euthymic with no change since starting on a lower Effexor dose.  (Tr. 782.)  At her June 29, 2020 appointment, she continued to report that she was doing well in terms of recovery.  (Tr. 790.)  Her mental status examination findings at her May 28 and June 29, 2020 appointments with Dr. Fikter were unchanged from her April 2020 appointment.  (*Compare* Tr. 778-79, 786-87 *with* Tr. 770-71.)

At her next video appointment with Dr. Fikter on October 5, 2020, Ms. Bauer reported she had been in county jail for thirty days for a probation violation after sounding intoxicated during a call with her probation officer.  (Tr. 792.)  She had stopped taking trazodone because it caused restless legs.  (*Id*.)  She had not taken naltrexone because the jail would not provide it to her.  (*Id*.)  Her mental status findings were unchanged.  (*Compare* Tr. 794-95 *with* Tr. 786-87.)

She attended a video appointment Dr. Fikter on April 21, 2021.  (Tr. 1431.)  She reported increased pain and problems sleeping.  (Tr. 1438.)  She was attending online meetings three times per week and talking with her sponsor four times per week.  (*Id*.)  Her mental status findings were unchanged from prior visits.  (*Compare* Tr. 1434 *with* Tr. 794-95.)  Dr. Fikter continued prescriptions for naltrexone, Effexor, oxcarbazepine, and Vistaril.  (Tr. 1438-39.)  He also advised her to continue taking over-the-counter melatonin and added amitriptyline.  (*Id*.)

8

Ms. Bauer was admitted to Windsor-Laurelwood Center for Behavioral Medicine ("Laurelwood") from July 19 through July 26, 2021, for detox, reporting she had been drinking a fifth of vodka daily for the past six months and using marijuana.  (Tr. 1405.)  On admission, she appeared completely confused and was hallucinating and slightly delirious.  (*Id*.)  Examination findings at discharge revealed that Ms. Bauer was calm, cooperative, and non-disruptive with clear speech.  (Tr. 1406.)  Her thought processes were linear, logical, coherent, and goal-directed; her judgment was intact; and her insight was fair.  (Tr. 1406-07.)  Her discharge diagnosis was severe alcohol use disorder.  (Tr. 1407.)  She was prescribed trazodone and Vistaril and discharged to a partial hospitalization program ("PHP").  (*Id*.)  Improvement in withdrawal symptoms and increased social interaction were noted on discharge.  (*Id*.)

Ms. Bauer started the PHP at Laurelwood the next day, attending from July 27 through August 9, 2021.  (Tr. 1419-29.)  Her presenting problems were anxiety and alcohol relapse.  (Tr. 1419.)  Her discharge summary reflects that she attended all groups, was very compliant with medication management, and developed better insight and a much more positive approach to her sobriety moving forward.  (*Id*.)  Her mental status examination at discharge reflected she was well groomed with cooperative behavior and normal speech.  (*Id*.)  She had a positive mood. (*Id*.)  She was tearful as she "relished her progress and noted its significance" and her affect was mood congruent.  (*Id*.)  Her thought processes and thought content were within normal limits, and her attention span and concentration were intact to conversation.  (*Id*.)  Her memory was within normal limits, and her insight and judgment were good.  (*Id*.)

Ms. Bauer returned to Dr. Fikter on August 19, 2021, for a telephone follow up.  (Tr. 1440.)  She reported she was stable on her current medications and doing well in terms of recovery.  (Tr. 1441.)  Her mental status examinations findings were similar, but slightly

different from her earlier findings.  (*Compare* Tr. 1442 *with* Tr. 1434.)  She was fully oriented

with unremarkable speech, an appropriate demeanor, a neutral/euthymic mood, full range of

affect, normal thought content, unremarkable thought process and perception, appropriate insight

and judgment, and grossly intact memory.  (Tr. 1442.)  Her diagnoses were generalized anxiety

disorder, alcohol abuse, and bipolar affective disorder, remission status unspecified.  (*Id*.)

### 2.    Opinion Evidence

#### i.    Physical Impairment Opinion Evidence

##### a.    Dr. Benzil's Opinion

Dr. Benzil completed a Physical Medical Source Statement on April 19, 2021.  (Tr. 1399-

1402.)  Dr. Benzil said she saw Ms. Bauer every two months for one year.  (Tr. 1399.)  She

identified the following diagnoses: lumbar radiculopathy and chondromalacia of both patellae.

(*Id*.)  She indicated that Ms. Bauer's prognosis was fair and identified the following symptoms:

pain, fatigue, and difficulty with ambulation.  (*Id*.)  She indicated Ms. Bauer had pain in the right

hip and down her lower leg, characterizing the pain as constant and severe.  (*Id*.)  She identified

the following clinical findings and objective signs: difficulty walking and extreme pain radiating

down the right leg.  (*Id*.)  She said Ms. Bauer's treatment included physical and medication

therapy, with medications causing drowsiness, dizziness, and an unstable gait.  (*Id*.)

Dr. Benzil opined that Ms. Bauer's impairments would limit her to: sitting or standing no

more than five minutes at a time; sitting, standing, or walking for less than two hours in an eight-

hour workday; occasionally lifting less than ten pounds; and never lifting ten or more pounds.

(Tr. 1400-01.)  She opined that Ms. Bauer would need to elevate her leg twelve inches above the

ground for 4% of the workday due to pain.  (Tr. 1400.)  She also opined that Ms. Bauer would be

off task 20% of the time, incapable of even "low stress" work, and absent from work more than

four days per month.  (Tr. 1401-02.)  However, she opined that Ms. Bauer would not need periods of time during the workday to walk around, unscheduled breaks during the workday, or an assistive device.  (Tr. 1400-01.)

### b.    State Agency Medical Consultants' Opinions

State agency medical consultant Mehr Siddiqui, M.D., completed a Physical RFC Assessment on November 7, 2020.  (Tr. 63-64.)  Dr. Siddiqui opined that Ms. Bauer had the following physical residual functional capacity:

- occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds;

- stand and/or walk six hours in an eight-hour workday;

- sit more than six hours in an eight-hour workday;

- occasionally stoop, crouch, crawl, and climb ladders, ropes, or scaffolds; and

- frequently climb ramps or stairs.

(*Id*.)   State agency medical consultant Steve McKee, M.D., agreed with Dr. Siddiqui's residual functional capacity opinion on reconsideration on April 3, 2021.  (Tr. 73-75.)

### ii.    Mental Health Impairment Opinion Evidence

### a.    Dr. Fikter's Opinion

Dr. Fikter completed a Mental Impairment Questionnaire on April 21, 2021.  (Tr. 1403-04.)  Dr. Fikter said he saw Ms. Bauer every two months for one hour.  (Tr. 1403.)  He identified the following diagnoses: generalized anxiety disorder, major depression, and bipolar disorder II. (*Id*.)  He indicated that Ms. Bauer had no side effects from her medications, which included gabapentin, Hydroxyzine, Effexor, and Tegretol.  (*Id*.)  He also indicated that Ms. Bauer's prognosis was fair and reported that the following "clinical findings" demonstrated the severity of her mental impairment and symptoms: extreme anxiety and severe depression.  (*Id*.)

11

Dr. Fikter gave his opinion as to Ms. Bauer's work-related limitations on a check-box form.  (Tr. 1403-04.)  He opined that Ms. Bauer had "unlimited or very good" abilities in all skill-areas relating to three of the four categories of mental functioning: understanding and memory; social interaction; and adaptation.  (Tr. 1404.)  In the final category of mental functioning—sustained concentration and persistence—he opined that Ms. Bauer had a "limited but satisfactory" ability to carry out very short and simple instructions and manage regular attendance and be punctual within customary tolerances, and was "seriously limited, but not precluded" in her ability to: maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with and proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 1403.)  He identified no areas in which Ms. Bauer had "no useful ability to function" or was "unable to meet competitive standards."  (Tr. 1403-04.)  He also opined Ms. Bauer would be absent from work four to five days per week due to her impairments or treatment and would be off task during the workday.  (Tr. 1404.)

### b.   Consultative Examiner's Opinion

Ms. Bauer presented to psychologist Herschel Pickholtz, Ed.D., on November 10, 2020, for a consultative psychological evaluation.  (Tr. 1320-29.)  When asked what prevented her from working, Ms. Bauer stated: "I just had back surgery and repaired 2 discs and had trouble holding jobs because of substance use disorder and depression and anxiety and bipolar."  (Tr. 1321.)  Dr. Pickholtz found that Ms. Bauer's "capacities for attention, concentration, memory, and intellectual levels of functioning based upon responses to the clinical interview fell within the average range and in the high average ranges during the cognitive section of the evaluation."

12

(Tr. 1327.)  She reported no problems with understanding and remembering television programming or written information.  (*Id*.)  Ms. Bauer "reported a history consistent with unspecified mood disorder with mixed features" which was "in partial remission and exacerbated by her addictive processing."  (*Id*.)  Ms. Bauer's "residual symptoms appear[ed] to be mild at worst."  (*Id*.)  Ms. Bauer reported "symptoms consistent with generalized anxiety disorder which appear[ed] to be mild."  (*Id*.)  Dr. Pickholtz noted that she appeared "to have a history consistent with an unspecified personality disorder related to addictive features."  (*Id*.)  Ms. Bauer was working part-time doing floral arrangements.  (Tr. 1324, 1327.)

Dr. Pickholtz diagnosed Ms. Bauer with: unspecified mood disorder with mixed features, currently in partial remission, exacerbated by addiction to cough medicine; generalized anxiety disorder, currently mild; other substance use disorder to cough medicine, moderate at least; alcohol use disorder with large amounts in recent remission; opioid use disorder with large amounts in recent remission; and unspecified personality disorder related to addictive features. (Tr. 1328.)  He provided a functional assessment of her work-related abilities, finding: no impairment in her overall capacities to understand, remember, and carry out instructions for simple work and more complex work; no impairment in her pace or persistence; very little impairment in her capacities to perform one to four step tasks; no significant impairment in her abilities to respond to supervisors and coworkers in a work setting; and a slight impairment at worst in her ability to respond to work pressures in a work setting, which would improve with counseling, continued use of psychiatric medications, and if she stopped ingesting cough medicine.  (Tr. 1328-29.)

### c.      State Agency Psychological Consultants' Opinions

State agency psychological consultant Carl Tishler, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 61-62) and Mental RFC Assessment (Tr. 64-66) on December 15, 2020.  Dr. Tischler opined in the PRT that Ms. Bauer was not limited in her ability to understand, remember, or apply information, and had moderate limitations in her ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself.  (Tr. 61.)  Dr. Tishler opined that Ms. Bauer had the following mental residual functional capacity: she would be unable to perform a job in which fast pace or externally imposed pace is an essential feature, such as assembly line work, but she would be able to perform an average-paced job; her attention might deteriorate over time and she should not perform work that is more than three steps in nature; she could interact with the general public and coworkers on a superficial basis, meaning of a short duration for a specific purpose; she should avoid settings with frequent changes, but could perform work in a predictable work environment, where changes in duties and tasks occur infrequently.  (Tr. 65.)

State agency psychological consultant Vicki Warren, Ph.D., completed a PRT (Tr. 71-72) and Mental RFC Assessment (Tr. 75-76) on reconsideration on April 1, 2021.  Dr. Warren affirmed Dr. Tishler's PRT and Mental RFC Assessment.  (Tr. 72, 76.)

### C.     Hearing Testimony

### 1.     Plaintiff's Testimony

Ms. Bauer testified in response to questioning by the ALJ and her representative at the September 9, 2021, telephonic hearing.  (Tr. 37-50.)  She said she stopped working because her lower back pain, which radiated into her right leg, became "really debilitating."  (Tr. 42.)  She also said her mental state had not been very good.  (Tr. 43.)

With respect to her back pain, Ms. Bauer said she saw a spine surgeon at the Cleveland Clinic and an MRI showed two herniated discs and a cyst on another disc.  (Tr. 42.)  She attempted to manage her pain with injections but ended up having surgery in August 2020 to repair the two herniated discs.  (*Id*.)  She said her doctors did not try to repair the cyst, hoping it would heal on its own.  (*Id*.)  She reported that the pain subsided for about one week, but then it returned.  (*Id*.)  She tried physical therapy and had recently reached out to the Cleveland Clinic because her pain was getting worse.  (*Id*.)  She said an MRI from March 2020 showed her cyst was bigger and that she had been advised to undergo a procedure in October 2020 to drain some of the fluid.  (Tr. 42-43.)

With respect to her mental health, Ms. Bauer said she was treating with a psychiatrist and seeing a therapist weekly.  (Tr. 43-44.)  She was taking medication for her anxiety and to prevent her from craving different substances; she had been self-medicating to deal with her anxiety and pain.  (Tr. 44.)  She also reported participating in a partial hospitalization program for chemical dependency, and said the doctor felt attention deficit disorder was a more appropriate diagnosis than bipolar II disorder because she was fidgety, off topic, and not focused.  (Tr. 44-45.)  She said she did not have problems interacting with people, but reported a little difficulty remembering things and some problems with maintaining concentration and attention.  (Tr. 48.)

Ms. Bauer lived with a roommate but usually stayed with her boyfriend at his place in the evenings.  (Tr. 38-39.)  She helped with some cooking and household chores, but rarely went shopping.  (*Id*.)  During a typical day, she said her boyfriend would drop her off at her place on his way to work at 6:00 a.m. and she would take care of her cats and then lie down until about noon.  (Tr. 39.)  She talked to her boyfriend on the telephone around lunchtime and then would lie down again until he picked her up after work around 4:00 p.m.  (*Id*.)  They would stop for

something to eat on their way back to his place and then would relax, watch television, and go to bed around 10:30 p.m.  (*Id.*)  She spent a lot of time sleeping during the day because her energy level was low.  (Tr. 49.)  She also stayed in bed for most of the day and did not bother trying to do anything because she could not finish things she started and that frustrated her.  (Tr. 49-50.)

Ms. Bauer had a driver's license, but her boyfriend usually drove her places.  (Tr. 38, 40.) She did not have a car of her own and it was difficult and tiring to walk to the bus stop, wait for the bus, and walk around a store.  (Tr. 40.)  She estimated being able to lift ten pounds, stand about ten minutes, and walk about ten minutes.  (Tr. 46.)  She could sit about five to seven minutes and had to change positions frequently while sitting because it put a lot of pressure on her back.  (Tr. 46.)  She reported some numbness and tingling in her right arm, with some shooting pain on her right side when using her arms to clean or lift small items.  (Tr. 46-47.)  She could reach to the front but it caused her some discomfort to reach overhead.  (Tr. 47.)  She could walk up and down the stairs, but had to do so slowly and usually had her boyfriend walk behind her because she lost her balance in the past and fell down the stairs.  (*Id.*)  She could get on her knees for a short period of time.  (*Id.*)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 50-54.)  She testified that Ms. Bauer's past relevant work as a registered nurse was a medium, skilled position.  (Tr. 51-52.) The VE further testified that an individual of Ms. Bauer's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination (Tr. 23, 52), could not perform Ms. Bauer's prior work, but could perform representative positions in the national economy, including storage facility clerk, marker, and mailroom clerk (Tr. 52-53).  The VE testified that there would be no work available if the individual would have difficulty

maintaining attention and would be absent at least three times a month on a fairly ongoing basis, or if the individual would struggle with her focus and be off task 20% of the time.  (Tr. 53-54.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her September 27, 2021, decision, the ALJ made the following findings:[2]

1. The claimant has not engaged in substantial gainful activity since August 5, 2020, the application date. (Tr. 20.)

2. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine status/post microdiscectomy; osteoarthritis of the right hip; psychoactive substance dependence; bipolar disorder; generalized anxiety disorder; major depressive disorder; alcohol use disorder; post-traumatic stress disorder (PTSD); personality disorder. (*Id.*) The claimant has the following non-severe impairments: cervical spondylosis; diverticulitis; degenerative joint disease of the right elbow; and history of skin cancer. (Tr. 20-21.)

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21-23.)

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except she can frequently climb ramps and stairs, no ladders, ropes, or scaffolds; she can occasionally stoop, kneel, crouch, and crawl; she can perform simple routine tasks with simple short instructions; she can make simple decisions, have occasional workplace changes, and no fast paced production quotas; she can have superficial interaction with coworkers, supervisors, and the public. (Tr. 23-27.)

5. The claimant is unable to perform any past relevant work. (Tr. 27-28.)

---

[2] The ALJ's findings are summarized.

6.      The claimant was born in 1978 and was 42 years old, defined as a younger individual age 18-49, on the date the application was filed.  (Tr. 28.)

7.      The claimant has at least a high school education.  (*Id*.)

8.      Transferability of job skills is not material to the determination of disability.  (*Id*.)

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including storage facility clerk, marker, and mailroom clerk.  (Tr. 28-29.)

Based on the above, the ALJ found Ms. Bauer had not been under a disability, as defined in the Social Security Act, since August 5, 2020, when the application was filed.  (Tr. 29.)

## V.      Plaintiff's Arguments

Ms. Bauer argues the ALJ erred when she found the opinions of Drs. Benzil and Fikter were not persuasive and failed to incorporate their opined limitations into the RFC.  (ECF Doc. 10, pp. 1, 8-13; ECF Doc. 13.)  Ms. Bauer also argues the ALJ erred when she concluded that Ms. Bauer's subjective statements regarding the limiting effects of her symptoms were only partially consistent with the evidence of record.  (ECF Doc. 10, pp. 1, 14-19.)

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that she failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

19

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

20

**B.      First Assignment of Error: Whether ALJ Properly Evaluated Persuasiveness of Opinions of Plaintiff's Treating Sources**

Ms. Bauer argues that the ALJ erred when she concluded that the medical opinions of Drs. Benzil and Fikter were not consistent with or supported by the medical evidence, and therefore failed to incorporate their opined limitations into the RFC.  (ECF Doc. 10, pp. 1, 8-13; ECF Doc. 13.)  The Commissioner responds that the ALJ's evaluation of the medical opinion evidence was supported by substantial evidence.  (ECF Doc. 12, pp. 14-22.)

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 416.920c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 416.920c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 416.920c(a), 416.920c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 416.920c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and

nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

The undersigned turns to whether the ALJ's evaluation of the medical opinions of Drs. Benzil and Fikter satisfied the regulatory framework for evaluation of medical opinion evidence.

### 1.    Dr. Benzil's Opinion

The ALJ evaluated the persuasiveness of Dr. Benzil's opinion as follows:

> The report completed by Dr. Deborah Benzil in April of 2021 is unpersuasive. <u>She completed a form checking boxes</u> noting the claimant can sit/stand/walk less than 2 hours a day. She noted that the claimant needs to elevate her legs during the workday. She noted that the claimant is incapable of even low stress work, and would be absent more than 4 days per month[]. <u>These opinions are an over-exaggeration of the claimant's residual functioning, and are inconsistent with the record</u>. After the claimant's surgery, she progressed in her therapy and was discharged due to goal achievement. While <u>a special relationship may exist,</u> <u>the conclusory and extreme limitations are inconsistent with the record,</u> and [are] unpersuasive.

(Tr. 26-27 (citation omitted) (emphasis added).)  Ms. Bauer contends that the ALJ erroneously based her persuasiveness finding "on the fact that Bauer completed physical therapy and was discharged due to goal achievement."  (ECF Doc. 10, p. 10.)  While she acknowledges that Ms. Bauer *was* discharged from physical therapy "due to goal achievement and maximal benefit," she argues the ALJ's finding was nevertheless in error because Ms. Bauer's discharge notes observed "that she continued to complain of radicular pain in the right lower extremity." (*Id.* (citing 1339).)  She calls the ALJ's findings a "misinterpretation of the record," argues that the medical records as a whole "supported and were consistent with the opinion of Dr. Benzil," and contends that the ALJ "erred when [s]he concluded that [Ms.] Bauer's symptoms disappeared." (*Id.*)

First, Ms. Bauer has failed to demonstrate that the ALJ "misinterpret[ed]" the medical records in analyzing Dr. Benzil's opinion.  As to Ms. Bauer's report of continued radicular pain in her right lower extremity at her final physical therapy appointment, the ALJ specifically considered this complaint in the context of clinical examination findings from the same appointment, which noted a full range of motion with peripheralization with repeated flexion and a normal gait.  (Tr. 25.)  With respect to the additional records highlighted in Ms. Bauer's brief, pointing to her need for surgical intervention and continued reports of hip and leg pain after surgery (ECF Doc. 10, p. 10 (citing Tr. 832-33, 1012-18, 1282, 1296, 1357)), the ALJ also considered both Ms. Bauer's surgery and her continued right hip and lateral leg pain in October 2020, after her surgery (Tr. 24).  Ms. Bauer has not identified specific material evidence that the ALJ mischaracterized or failed to address, and the undersigned is aware of none.

Second, Ms. Bauer's argument that the medical records "supported and were consistent with the opinion of Dr. Benzil" mistakes the applicable standard.  Even if a preponderance of the evidence supported a finding that Dr. Bauer's opinion was persuasive, this Court cannot overturn the ALJ's opposite finding "so long as substantial evidence also support[ed] the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Here, the ALJ based her finding that Dr. Benzil's opinion was unpersuasive on several considerations.  She noted that the opinion was set forth in a "form checking boxes" and contained "conclusory" limitations (Tr. 26-27), both of which courts recognize to be valid considerations undermining the persuasiveness of a medical opinion. *See, e.g., Kreilach v. Comm'r of Soc. Sec.*, 621 F. Supp. 3d 836, 847 (N.D. Ohio 2022) (citing *Ellars v. Commissioner of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) (collecting cases)).  She also characterized Dr. Benzil's findings—that Ms. Bauer cannot sit or stand for more than five minutes at a time, cannot sit/stand/walk for even two hours in a

workday, cannot lift even ten pounds, would be off-task 20% of the workday, and would likely be absent more than four days per month—as "extreme limitations . . . inconsistent with the record" and "an over-exaggeration" of Ms. Bauer's residual functioning in light of  her successful completion of physical therapy following surgery.  (Tr. 26-27.)  Ms. Bauer has not met her burden to show that these findings lacked the support of substantial evidence.

In her decision, the ALJ acknowledged Ms. Bauer's severe back and hip impairments (Tr. 20), provided a detailed discussion of her back and hip imagery, August 2020 surgery, and post-surgical treatment and follow-up through her discharge from physical therapy "due to goal achievement and maximal benefit" in March 2021 (Tr. 24-25), and considered the opinions of the state agency medical consultants (Tr. 26).  The opinions of the state agency physicians called for limitations very similar to those adopted by the ALJ.  (Tr. 23, 26.)  The ALJ found those opinions generally consistent with the record, in that: "After the claimant's surgery, notes showed that the claimant improved and physical exams were generally normal."  (Tr. 26.)  This characterization is consistent with the medical records already described and discussed by the ALJ.  These findings supply substantial evidence to support the ALJ's conclusion that the "extreme" limitations outlined in Dr. Benzil's check-box opinion are inconsistent with the record, and Ms. Bauer has not met her burden to demonstrate otherwise.

Ms. Bauer argues that the ALJ's persuasiveness finding was based on an unsupported conclusion that her symptoms had "disappeared."  (*Id*. at pp. 10-11.)  But the ALJ made no such finding.  The ALJ acknowledged evidence that Ms. Bauer continued to complain of symptoms following her discharge from physical therapy,[3] but found the RFC limitations described by the state agency physicians to be better supported by the record than the "extreme" limitations set

---

[3] As explained in Section VI.C., *infra*, the undersigned also finds no merit in Ms. Bauer's argument that the ALJ erred in evaluating her subjective symptoms.

24

forth in Dr. Benzil's check-box opinion.  The ALJ clearly articulated her reasons for finding Dr. Benzil's opinion unpersuasive, and her determination was supported by substantial evidence.

### 2. Dr. Fikter's Opinion

The ALJ evaluated the persuasiveness of Dr. Fikter's opinion, explaining:

> The <u>checklist impairment questionnaire</u> completed by Dr. William Fitker is unpersuasive. He noted that the claimant would be absent 4-5 days per week from work. However, <u>in the last three "B" criteria areas, he noted no limitations</u>[]. It is hard to imagine how the claimant would be absent 5 days a week, but have no limitations in understanding/memory limitations, social interaction, or adaptation. <u>Additionally, this conclusory statement is unsupported by the record</u>, which noted generally normal mental status exams. While <u>a special relationship may exist, the report is internally inconsistent, and unsupported by the record</u>.

(Tr. 27 (citation omitted) (emphasis added).)

Ms. Bauer argues that the ALJ's persuasiveness finding lacks the support of substantial evidence.  (ECF Doc. 10, pp. 11-13; ECF Doc. 13.)  While she acknowledges that Dr. Fikter found no limitations in three of four areas of mental functioning—understanding/memory, social interaction, and adaptation—she nevertheless argues that the ALJ's finding was in error because Dr. Fikter's opinion that she "would have serious problems in her sustained concentration and persistence . . . supported the opinion that she would be unable to complete a normal workweek." (ECF Doc. 10, p. 11.)  She also argues that the ALJ failed to consider certain records in finding Dr. Fikter's opinion to be unpersuasive, including records regarding her mental health treatment and hospitalizations/treatment for substance abuse, and further asserts that the ALJ failed to "give a coherent explanation for her reasoning."  (*Id*. at pp. 11-13.)

As to Ms. Bauer's assertion that serious problems in only one category of mental functioning *can* support an opinion that an individual "would be unable to complete a normal workweek" (ECF Doc. 10, p. 1), that is not the question before the Court in this case.  The question is not whether substantial evidence supports Ms. Bauer's preferred finding that Dr.

Fikter's opinion is persuasive.  This Court cannot overturn the ALJ's contrary finding "so long as substantial evidence . . . support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Thus, the question is whether Ms. Bauer has met her burden to demonstrate that the ALJ's persuasiveness finding lacked the support of substantial evidence.

Here, the ALJ based her conclusion that Dr. Fikter's opinion was unpersuasive on several considerations.  She noted that the opinion was a "checklist impairment questionnaire" containing "conclusory" statements, both appropriate considerations in assessing persuasiveness. *See, e.g., Kreilach*, 621 F. Supp. 3d at 847; *Ellars*, 647 F. App'x at 567.  She also observed that the opinion was "internally inconsistent," opining that Ms. Bauer would be absent four to five days per week (without supporting explanation) despite also opining that Ms. Bauer had no limitations in three out of four areas of mental functioning, observations relevant to both supportability and consistency.  *See, e.g., Aminta C. v. Comm'r of Soc. Sec. Admin.*, No. 3:20-CV-226, 2022 WL 740929, at *4 (S.D. Ohio Mar. 11, 2022).  Finally, she observed that Dr. Fikter's stated limitations were "unsupported by the record."  (Tr. 27.)  So long as there is substantial evidence to support these findings, the ALJ's determination must be upheld.

Ms. Bauer's argument that the ALJ "failed to address the contrary evidence establishing support and consistency" for Dr. Fikter's opinion (ECF Doc. 10, p. 13) is underdeveloped and lacks merit.  Rather than identifying specific evidence the ALJ failed to address, Ms. Bauer has summarized a variety of records and generally asserted that "contrary evidence" was not addressed.  (*Id.* at pp. 11-13.)  While this Court "need not comb through the record for proof" to support Ms. Bauer's argument, *Webb v. Comm'r of Soc. Sec. Admin.*, No. 1:19-CV-0123, 2019 WL 6695828, at *3, n. 4 (N.D. Ohio Dec. 9, 2019), even a cursory comparison reveals that the ALJ did in fact discuss: (1) Ms. Bauer's attendance at counseling (Tr. 24 (citing Tr. 696)); (2)

26

her treatment with Dr. Fikter (Tr. 25 (citing Tr. 1434); and (3) her two admissions at Windsor-Laurelwood Center (Tr. 24 (citing Tr. 532, 534-35), Tr. 25-26 (citing Tr. 1406, 1421-22)).  The ALJ need not discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  Ms. Bauer has not shown that the ALJ mischaracterized the record or ignored material evidence that deprived her analysis of the support of substantial evidence.

The ALJ accurately described the mental health treatment records she did discuss, and had no obligation to describe every treatment visit or medical finding.  In all, she identified several severe mental impairments (Tr. 20), accurately described Ms. Bauer's hospitalizations and select mental health treatment records (Tr. 24-26), and considered the opinions of the state agency psychological consultants and psychological consultative examiner (Tr. 26).  She found the opinion of the consultative examiner unpersuasive because it was vague and did not give sufficient credence to Ms. Bauer's subjective complaints.  (*Id.*)  In contrast, she found the opinions of the state agency consultants persuasive because "[m]entally, mental status exams were generally normal despite the subjective complaints, supporting no more than moderate limitations."  (*Id.*)  She went on to find Dr. Fikter's opinion unpersuasive in part because it was "unsupported by the record," as discussed above.  (Tr. 27.)  She then adopted mental RFC limitations similar to those articulated by the state agency consultants, observing:

> Mentally, status exams were generally normal. Speech had regular rate, rhythm, and volume. Thought process was logically intact. She had no suicidal or homicidal ideations. Memory was normal. Attention span and concentration were intact. Fund of knowledge was above average. Judgment was within normal limits.

(*Id.*)  The ALJ's characterization of Ms. Bauer's mental status examination findings as "generally normal" is consistent with the medical records in evidence, both those of Dr. Fikter

and those of other providers.  (*See, e.g.,* Tr. 770-71, 778-79, 786-87, 794-95, 1405-07, 1419,

1434, 1442.)  The undersigned finds the ALJ sufficiently articulated her reasons for concluding

that Dr. Fikter's opinion was not persuasive, and Ms. Bauer has not shown that those reasons

lacked the support of substantial evidence.

For the reasons set forth herein, the undersigned concludes that the ALJ considered the

entirety of the record when evaluating the persuasiveness of the medical opinions of Dr. Benzil

and Dr. Fikter, sufficiently articulated her reasons for finding the opinions unpersuasive, and

made findings supported by substantial evidence.  Accordingly, the undersigned finds Ms.

Bauer's first assignment of error to be without merit.

**C.    Second Assignment of Error:  Whether ALJ Properly Considered Subjective Symptoms**

In her second assignment of error, Ms. Bauer argues that the ALJ erred in her evaluation

of Ms. Bauer's subjective symptoms because she should have found that that the intensity,

persistence, and limiting effects of Ms. Bauer's symptoms, including her pain, precluded her

from engaging in substantial gainful activity on a full-time sustained basis.  (ECF Doc. 10, pp.

14-19.)  She also contends the ALJ "failed to articulate any supportable rationale" for finding her

statements only partially consistent with the record.  (*Id.*)  The Commissioner responds that the

ALJ's evaluation of Ms. Bauer's subjective complaints was supported by substantial evidence.

(ECF Doc. 12, pp. 18-23.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms,

a determination is first made as to whether there is an underlying medically determinable

impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-

3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007)

(citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate the

intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 23-24), so the discussion will be focused on the ALJ's compliance with the second step.

When the alleged symptom is pain, an ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 416.929(c).  *See Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  Those factors include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 416.929(c)(3).

Here, the ALJ considered Ms. Bauer's alleged limitations in remembering and completing tasks, engaging in social activities, and managing her mood, and acknowledged her testimony that she could not work due to back pain.  (Tr. 22, 23.)  She also acknowledged and considered Ms. Bauer's testimony that she had difficulty sitting, standing, walking, lifting, reaching, and performing certain activities of daily living because of her symptoms.  (*Id.*)  Nevertheless, she found that her "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 23.)  More specifically, she found Ms. Bauer's subjective statements were "only partially consistent with both the objective and subjective evidence of record, because the treatment notes do not show the serious symptoms and dysfunction that would be expected were the claimant as limited as alleged."  (Tr. 24.)

In arguing that the ALJ erred in evaluating her subjective complaints, Ms. Bauer provides a lengthy recitation of evidence followed by a conclusory argument that the ALJ's finding was in

error because "it was contrary to the medical evidence" which "document[ed] that [Ms.] Bauer had pain and symptoms related to her psychological and physical impairments." (ECF Doc. 10, pp. 14-18.) She argues further that "the record failed to support the fact that [Ms.] Bauer's continuing pain would allow her to engage in full-time and sustained activity." (*Id.* at p. 18.) It is again observed that "the Court itself need not comb through the record for proof" to support Ms. Bauer's arguments. *Webb*, 2019 WL 6695828, at *3, n. 4. Ms. Bauer has described her own testimony, the medical records, and certain opinion evidence. (ECF Doc. 10, pp. 14-18.) Likewise, the ALJ acknowledged and discussed the testimony, medical records, and opinion evidence. (Tr. 22-27.) Ms. Bauer has not met her burden to show how the ALJ's analysis of her subjective complaints failed to meet the regulatory standard.

A review of the decision reveals that the ALJ considered evidence that Ms. Bauer complained of pain after her surgery, but also considered her normal physical examination findings, including full motor strength in the upper and lower extremities and intact sensation in October 2020 (Tr. 23, 24, 1296) and full lumbar range of motion and normal gait in November 2020 (Tr. 25, 1365). The ALJ also considered Ms. Bauer's response to treatment, including her discharge from physical therapy in March 2021 due to goal achievement and maximal benefit. (Tr. 25, 1339.) She considered medications Ms. Bauer used to manage her pain. (Tr. 24, 1296.) She considered Ms. Bauer's report that she had increased pain with prolonged standing and walking in January 2021, but also that she reported being able to perform all functional activities. (Tr. 25, 1353.) These findings support the ALJ's finding that Ms. Bauer's physical treatment notes do not fully support the serious symptoms and dysfunction she subjectively claims.

The ALJ also considered Ms. Bauer's allegations that she had limitations in her ability to remember and complete tasks, engage in social activities, and manage her mood (Tr. 22, 23), but

30

observed that Ms. Bauer generally exhibited normal mental status examination findings.  (Tr. 25-26, 1406-07, 1421-22, 1434.)  She considered evidence of activities of Ms. Bauer's daily living, including her reports in November 2020 that she shopped, cooked, saw her boyfriend daily, and went out to eat, to the movies, to casinos, and on walks with her boyfriend.  (Tr. 25, 1327.)  She also documented evidence supporting no more than moderate limitations in the four categories of mental functioning, including Ms. Bauer's ability to cook, attend to medical appointments, drive, read, use the internet, shop, spend time with family and friends, interact well with medical providers, maintain appropriate hygiene and grooming, and care for pets.  (Tr. 22.)  These findings support the ALJ's conclusion that Ms. Bauer's mental treatment records do not fully support the serious symptoms and dysfunction she subjectively claims.

The ALJ also considered and evaluated the medical opinion evidence of record, including the opinions of Ms. Bauer's treating providers,[4] the state agency consultants, and the consultative examining psychologist.  (Tr. 26-27.)  She adopted RFC limitations similar to those articulated by the state agency consultants, found the treating providers' opinions unpersuasive for the reasons discussed in Section VI.B., *supra*, and found the consultative examiner did not give sufficient credence to Ms. Bauer's subjective complaints.  (*Id.*)  The ALJ's analysis of the opinion evidence further reinforces her conclusion that the record does not fully support Ms. Bauer's subjective complaints.  Ms. Bauer's observation that the state agency psychological consultants found certain limitations appropriate (ECF Doc. 10, p. 17) does not change this analysis, since the ALJ found those opinions persuasive and adopted RFC limitations consistent with those limitations (Tr. 23, 26).[5]

---

[4] Ms. Bauer's challenge to the ALJ's evaluation of the opinions of the Drs. Benzil and Fikter (ECF Doc. 10, p. 18) was found to be without merit in Section VI.B, *supra*.

[5] Ms. Bauer has not challenged the ALJ's findings regarding the persuasiveness of the state agency consultants' opinions, and any such argument is waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

Importantly, the ALJ did not find that Ms. Bauer's subjective statements regarding her symptoms were wholly inconsistent with evidence of record or that her conditions resulted in no physical or mental limitation.  Instead, she credited Ms. Bauer's subjective complaints of pain to the extent supported by the evidence and found she had the physical residual capacity to perform a reduced range of light work.  (Tr. 23.)  She also credited Ms. Bauer's subjective symptoms relating to her mental health conditions to the extent supported by the evidence and found she had the mental residual capacity to: perform simple routine tasks with short simple instructions, make simple decisions and have occasional workplace changes with no fast pace productions quotas, and interact on a superficial basis with coworkers, supervisors, and the public.  (*Id.*)  The ALJ explained her RFC assessment, stating:

> Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by both the objective and subjective medical evidence of record. The claimant testified at the hearing that she prepares meals and washes dishes occasionally. She shops, but rarely. She has difficulty with dressing herself. She watches TV. She takes the bus but does not drive. She cannot work due to back pain. She noted difficulty standing and walking. She has pain laying down. She can lift 10 pounds, stand 10 minutes, and walk 10 minutes. She can sit for 5-7 minutes. She gets numbness/tingling in her right arm. Reaching overhead causes discomfort. She has occasional problems remembering.
>
> The evidence of record shows that after the claimant's surgery, she underwent therapy and progressed. On March 3, 2021, the claimant was discontinued from physical therapy services due to goal achievement and maximal benefit. She had full range of motion but did get peripheralization with repeated flexion. Her gait was normal.
>
> Mentally, status exams were generally normal. Speech had regular rate, rhythm, and volume. Thought process was logically intact. She had no suicidal or homicidal ideations. Memory was normal. Attention span and concentration were intact. Fund of knowledge was above average.  Judgment was within normal limits.

(Tr. 27.)  Ms. Bauer's argument that the ALJ failed to adequately articulate her rationale for finding her subjective complaints only partially consistent (ECF Doc. 10, p. 19) is without merit.

While Ms. Bauer argues that the evidence supports a finding that the symptoms from her back, leg, and hip pain and mental impairments were more limiting than the ALJ found them to be, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  Ms. Bauer has not met her burden to show that the ALJ erred in considering her subjective complaints, and the ALJ adequately explained her reasons for finding the subjective complaints were not entirely consistent with other evidence in the record.  Ms. Bauer's second assignment of error is without merit.

## VII.   Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

October 31, 2023

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).